# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| GABRIEL LUGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 26-cv-886 |
| | ) | |
| CITY OF MILWAUKEE, CHARLES | ) | |
| MUELLER, SCOTT GASTROW, ABNER | ) | |
| VALCARCEL, DAVID SALAZAR, PAUL | ) | |
| LOUGH, TIMOTHY HEIER, MATTHEW | ) | JURY DEMAND |
| GOLDBERG, BRIDGET BOYLE, and | ) | |
| LLOYD'S OF LONDON, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Gabriel Lugo, by and through his attorneys, the People's Law Office, hereby alleges as follows:

## INTRODUCTION

1. Plaintiff Gabriel Lugo brings this action under the Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13, 42 U.S.C. § 1983 and Wisconsin state law seeking redress for damages caused by the unconstitutional and tortious misconduct of Milwaukee Police Department ("MPD") detectives, who engaged in a conspiracy to fabricate evidence and withheld exculpatory and exonerating evidence from Plaintiff which resulted in his unjust conviction and 14 years of incarceration for a homicide he did not commit.

2. Plaintiff was convicted of the homicide of Jake Gerard, who was shot and killed outside of an after-hours club in Milwaukee by Jose Luis Suares (also known as Joel Ortiz) or Luis Correa. Gerard was an innocent bystander; the intended target of the shooting was

Reymundo Trinidad, who was working security at the after-hours club and had argued with Suares, Correa, and their friend Jean Carlos Montanez earlier in the night.

3.      During the investigation of the Gerard homicide, Defendant MPD detectives Salazar, Lough, Heier, and Goldberg encouraged and facilitated Correa and Suares to make false and fabricated statements implicating Plaintiff in the homicide.

4.      Although he was innocent, Plaintiff was convicted based on the false testimony of Suares and Correa, who identified Plaintiff as the shooter to hide their own guilt.

5.      Shortly after Plaintiff was convicted, during his direct appeal process, Defendant MPD detectives Mueller, Gastrow, and Valcarcel—all of whom were involved in the Gerard homicide investigation—interviewed Reymundo Trinidad, who was providing information to law enforcement in exchange for a reduction in his sentence for unrelated crimes. Trinidad told Defendants Mueller, Gastrow, and Valcarcel that Plaintiff was innocent of the Gerard homicide and that Jose Luis Suares or Luis Correa were the real shooters.

6.      Defendants Mueller, Gastrow, and Valcarcel withheld this exculpatory and exonerating evidence from the Milwaukee County District Attorney's Office and from Plaintiff and his defense attorney, causing Plaintiff to spend the next 12 years in prison for a crime he did not commit.

7.      In 2023, after an evidentiary hearing where Trinidad testified that Plaintiff was not involved in the shooting, Milwaukee County Circuit Court Judge Glenn Yamahiro granted Plaintiff's post-conviction motion, vacated his conviction, ordered a new trial, and the Milwaukee County District Attorney's Office formally dismissed his case.

2

8. Plaintiff now seeks redress under 42 U.S.C. § 1983 and Wisconsin state law for the official misconduct that caused his wrongful conviction and imprisonment and the immense and irreparable injuries he sustained while incarcerated.

9. Plaintiff further seeks to hold accountable his former criminal defense attorney Bridget Boyle, who has been the subject of repeated disciplinary complaints charging ethical violations, incompetence, and neglect of her duties to her clients and as a result voluntarily relinquished her law license in 2014. Boyle failed to adequately investigate Plaintiff's case and as a result did not present the obvious defense that Suares and Correa—who provided the sole evidence linking Plaintiff to the crime—were in fact the real perpetrators. Moreover, after his conviction, Boyle abandoned Plaintiff's appeal, costing him years of additional incarceration that would have been avoided with the aid of effective counsel. Boyle's incompetence contributed to Plaintiff's wrongful conviction and elongated his period of incarceration, amounting to legal malpractice.

**JURISDICTION AND VENUE**

10. Plaintiff brings this action pursuant to the Civil Rights Act of 1871, ch. 22, § 1, 17 Stat. 13, 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights as secured by the United States Constitution.

11. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, original subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b)(1), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims arising under Wisconsin state law.

12. Venue is proper in the Eastern District of Wisconsin under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in this district.

## ADMINISTRATIVE EXHAUSTION

13.     Plaintiff served a Notice of Claim providing actual notice of his claims and otherwise complied with all preconditions set forth in Wis. Stat. § 893.80 to bring state law claims against Defendants Mueller, Gastrow, and Valcarcel. The City of Milwaukee failed to disallow the claim within 120 days of service.

## PARTIES

14.     Plaintiff Gabriel Lugo is a 37-year-old Puerto Rican man and was at all times relevant to this suit a resident of the State of Wisconsin.

15.     At all times relevant to this suit, Defendants Charles Mueller, Scott Gastrow, Abner Valcarcel, David Salazar, Paul Lough, Timothy Heier, and Matthew Goldberg were police detectives employed by the Milwaukee Police Department.

16.     The Defendant Officers are sued in their individual capacity and acted under color of law and within the scope of their employment.

17.     Defendant City of Milwaukee is a Wisconsin municipal corporation, was the employer of the Defendant Officers, and is and was at all times relevant to this Complaint responsible for the policies, practices, and customs of the Milwaukee Police Department.

18.     Defendant Bridget Boyle was previously an attorney licensed in the state of Wisconsin who represented Plaintiff during his criminal case.

19.     Defendant Lloyd's of London is an insurance company licensed to do business in the State of Wisconsin and currently provides or did provide legal malpractice insurance for Defendant Boyle during the time periods relevant to this suit.

4

## FACTUAL ALLEGATIONS

### The Crime

20. During the early morning hours of April 19, 2008, Jose Luis Suares (AKA Joel Ortiz), Luis Correa, and Carlos Montanez arrived at an after-hours club in Milwaukee, where Reymundo Trinidad was working security.

21. As the men approached the club, a friend of Trinidad's identified Suares as someone who had previously stolen drugs from him and owed him money.

22. Trinidad stopped the men at the door and would not allow them to enter; an altercation then took place between Trinidad and Suares, during which Trinidad shoved Suares against the wall and threatened to shoot him.

23. Suares, Correa, and Montanez walked back to Suares's vehicle, a white Dodge Charger, about a half block away.

24. After a few minutes, Trinidad approached Suares's car to tell the men they could enter the bar after all, but they declined.

25. A short time later, Suares and Correa, angry at how they had been treated by Trinidad, grabbed guns, and fired 6 or 7 shots toward Trinidad from approximately 200 feet south of the club.

26. Suares and Correa missed Trinidad but one of the bullets they fired struck and killed Jake Gerard who was standing outside the club.

27. Suares, Correa, and Montanez fled to Montanez's house, where they learned that Gerard had been shot.

28. Shortly thereafter, the men concocted a false story that blamed the shooting on Plaintiff, who was known to them.

5

29.     The men agreed to say that after the initial confrontation with Trinidad, Plaintiff Lugo came to the bar with a gun and shot Gerard.

**The Police Investigation**

30.     All of the Defendant Officers participated in the Jake Gerard homicide investigation.

31.     The first major breakthrough in the investigation happened on April 21, 2008, when Defendants Paul Lough and David Salazar interviewed Reymundo Trinidad. Trinidad told Lough and Salazar that he was an eyewitness to the shooting and was the target of the deadly attack.

32.     Trinidad told Defendants Lough and Salazar that he had a confrontation with three men when he denied them entry into the after-hours club, and that those three men were the shooters and were shooting at him when Gerard was accidentally struck by one of the bullets.

33.     Trinidad further revealed to these Defendants that after he turned the three men away, they came back in a white Dodge Charger and two people began firing from the vehicle at him. Trinidad was reluctant to provide the identities of the shooters but stated that one of the three men, the driver of the vehicle, was a Dominican whom he identified as "Jose Luis."

34.     Defendant Abner Valcarcel assisted with identifying "Jose Luis" and determined that "Jose Luis" was Suares, AKA Joel Ortiz, who was known to the MPD as a drug dealer.

35.     Defendants Lough and Salazar showed Trinidad a photo array, and Trinidad identified Suares as the individual driving the white Charger.

36.     Sometime afterwards, Defendant Gastrow went to the Milwaukee County District Attorney's office to seek charges against Trinidad for felon in possession of a firearm related to the Gerard shooting, which were approved by the DA.

6

37. Through interviews with multiple witnesses who saw Trinidad's confrontation with the three men, the Defendant Officers quickly determined that the three individuals whom Trinidad denied entry to the after-hours club were Suares, Correa, and Montanez.

38. The Defendant Officers therefore knew, shortly after interviewing Trinidad, that one of those three men fired the shot that killed Gerard.

39. On April 23, 2008, Defendants Heier and Goldberg interviewed Carlos Montanez.

40. Montanez, having previously agreed with Suares and Correa that they would pin the crime on Plaintiff so as to escape blame themselves, told Defendants Heier and Goldberg that Plaintiff was the shooter.

41. The Defendant Officers knew that Montanez was lying, but they nevertheless encouraged Montanez to provide a false and fabricated statement implicating Plaintiff as the shooter and memorialized his false and fabricated statement in a police report.

42. On April 24, 2008, Trinidad told a non-defendant MPD detective that he was angry that he had been charged with a crime related to the incident, and that he would not cooperate further with law enforcement or identify Suares at trial.

43. Up to this point, Trinidad had not specifically identified the people who fired the shots at him.

44. After that interview, the Defendant Officers knew that they would not be able to prove a case against Suares, Correa, and/or Montanez without Trinidad's cooperation.

45. In light of Montanez's cooperation and willingness to point the finger at Plaintiff, the Defendant Officers decided to pin the crime on Plaintiff, despite knowing that he was innocent and that the real culprit was either Suares, Correa, or Montanez.

7

46. Later in the night on April 24, Defendants Lough and Salazar interviewed Luis Correa. Correa falsely asserted that after the altercation with Trinidad outside the club, Correa called Plaintiff, who came to the scene and fired the fatal shots.

47. In that interview, Correa admitted that he fired a shot from a 9 mm handgun but stated that it was a misfire and the gun broke.

48. Defendants Lough and Salazar knew that Correa was lying, and that Plaintiff was not the shooter and was not even present at the scene. Nevertheless, they encouraged and facilitated Correa to make a false and fabricated statement implicating Plaintiff and memorialized this false and fabricated statement in a police report.

49. On May 1, Defendants Heier and Goldberg interviewed Suares. Suares confirmed that he was the driver of the car and that Correa fired a gun once, but falsely stated that Plaintiff was the other shooter.

50. Defendants Heier and Goldberg knew that Suares was lying, and that Plaintiff was innocent. Nevertheless, they encouraged and facilitated Suares to make a false and fabricated statement implicating Plaintiff and memorialized this false and fabricated statement in a police report.

51. Because Suares's initial statement did not line up with Correa's, Defendants Heier and Goldberg presented Suares with a copy of Correa's statement to enable him to better conform his false account to Correa's.

52. Defendants Heier and Goldberg did not document Suares's initial, inconsistent account in their report.

8

53. The statements that Suares, Correa, and Montanez made to the Defendant Officers contained numerous glaring inconsistencies that further established to the Defendant Officers that their false and manufactured stories implicating Plaintiff were not credible.

54. The Defendant Officers took steps to ensure that Suares, Correa, and Montanez were housed together in the House of Corrections so that they had an opportunity to better align their stories to make them more believable witnesses at Plaintiff's trial.

55. Milwaukee police detectives found no forensic evidence that connected Plaintiff to the crime and established no motive for Plaintiff to shoot either Trinidad or Gerard.

56. The Defendant Officers deliberately ignored or discredited any evidence that undermined their false narrative.

57. Other than Suares, Correa, and Montanez, no witness placed Plaintiff at the scene before, during, or after the shooting. The Defendant Officers deliberately ignored that evidence.

58. Knowing that he would not support their false case against Plaintiff, the Defendant Officers purposely did not re-interview Trinidad, a confirmed eyewitness to the shooting, to inquire whether he saw Plaintiff at the scene or whether Plaintiff was one of the shooters.

59. Despite his innocence, on May 2, 2008, Plaintiff was charged with first degree reckless homicide, as a party to a crime, and while armed with a dangerous weapon.

60. Defendant Mueller was the detective who authored the criminal complaint against Plaintiff, causing him to be charged by the Milwaukee County District Attorney's Office.

61. On June 11, 2008, Defendants Mueller and Gastrow interviewed a detainee named Christopher Johnson, who stated that Suares made statements to him in jail regarding the

9

homicide that were exculpatory of Plaintiff. Defendants Mueller and Gastrow ignored that information and took no steps to stop the baseless prosecution against Plaintiff, an innocent man.

**Defendant Boyle Fails to Investigate**

62. In June 2008, Plaintiff retained Defendant Boyle to represent him in his criminal case.

63. Defendant Boyle was a criminal defense attorney who has been the subject of repeated disciplinary complaints charging ethical violations, incompetence, and neglect of her duties to her clients and as a result voluntarily relinquished her law license in 2014.

64. Despite knowing that Reymundo Trinidad was an eyewitness to the shooting and had identified Suares to the police as the driver of the vehicle from which the shots were fired, Defendant Boyle made no effort to locate or interview Trinidad to determine if he would exonerate Plaintiff.

65. Defendant Boyle made no effort to procure Trinidad's testimony for trial.

66. Despite knowing that Christopher Johnson had given police crucial information that was exculpatory of Plaintiff and that he was willing to testify, Defendant Boyle made no effort to interview him or procure his testimony for trial.

67. Defendant Boyle made no effort to interview Suares, Correa, Montanez, or any other witness prior to trial.

68. Defendant Boyle did not develop a third-party perpetrator defense or file a *Denny* motion to receive leave to present such a defense, despite the clear evidence that Suares and Correa were the real shooters and that the three men had colluded to pin the crime on Plaintiff to protect themselves from facing accountability for their crime.

10

69. Prior to trial, Defendant Boyle met with Plaintiff on only two occasions even though he had been released on bond and was freely available to her to assist with investigating his case and developing his defense.

70. Defendant Boyle did not gather enough information to make an informed decision about whether to put Plaintiff on the stand in his own defense.

## The Criminal Trial

71. In May 2009, Plaintiff's case was tried before a jury for five days.

72. The prosecution's case at trial relied entirely on the testimony of Suares, Correa, and Montanez, who all identified Plaintiff as the shooter.

73. Prior to trial, MPD detectives met with Suares, Correa, and Montanez to ensure that they would stick to their false and fabricated story that Plaintiff was the shooter, despite knowing that Suares and Correa were the real shooters and that all three witnesses intended to provide perjured testimony.

74. Defendant Gastrow attended the entire criminal trial and sat next to the Assistant District Attorney at counsel's table.

75. At trial, Defendant Boyle did not present a third-party perpetrator defense and did not argue that Suares and Correa were the real shooters, despite the clear evidence supporting that theory and the fact that the State's entire case depended on their false testimony.

76. At trial, Defendant Boyle did not call Reymundo Trinidad or Christopher Johnson to testify, despite the fact that both of their statements to police contained crucial evidence that was exonerating to Plaintiff.

77. At trial, Defendant Boyle did not put Plaintiff on the stand to testify in his own defense, despite the absence of any strategic justification not to do so.

11

78. Suares was in custody with five prior convictions when he testified at Plaintiff's trial. He was given a proffer letter promising dismissal of his felony charge (from the same event) in exchange for his testimony.

79. Correa was also in custody with ten prior convictions when he testified at Plaintiff's trial. He also had a deal to testify against Plaintiff—he had pled guilty to only a felon in possession of a firearm charge, and had his sentencing continued to determine what consideration he would receive based on how well he performed as a witness against Plaintiff.

80. On the basis of Suares's, Correa's, and Montanez's testimony, the jury convicted Plaintiff of first-degree reckless homicide.

81. The jury was originally deadlocked and reached a verdict only after the court issued an *Allen* instruction.

82. Plaintiff was subsequently sentenced to 30 years in prison and 8 years of extended supervision.

### Defendant Boyle Abandons Plaintiff's Appeal

83. After his conviction, Plaintiff filed a notice of intent to pursue post-conviction relief.

84. Defendant Boyle performed no work on Plaintiff's appeal, did not communicate with Plaintiff at all, and effectively abandoned him following his conviction.

85. As a result, Plaintiff's case languished for years without action.

86. After years of effort by Plaintiff and his family to secure competent post-conviction counsel, Plaintiff's direct appeal rights were reinstated in December 2017 on the basis of ineffective assistance of counsel.

12

87. Had Defendant Boyle filed a timely appeal, Plaintiff's conviction would have been overturned years sooner.

**Defendants' Withholding of Exculpatory Evidence**

88. In April 2010, Reymundo Trinidad was arrested, charged with numerous felonies in Milwaukee County, and indicted for bank robbery in the United States District Court for the Eastern District of Wisconsin.

89. Later in 2010, Trinidad began cooperating with law enforcement by providing information regarding drug dealing and violent crimes in Milwaukee in exchange for a reduction in his sentence.

90. As part of this cooperation, Trinidad was debriefed at least four times by Defendants Mueller and Gastrow in 2011 and 2012 regarding multiple criminal investigations.

91. Trinidad was also debriefed by Defendant Valcarcel, along with FBI Agent Travis Homer, on September 16, 2011.

92. These debriefings occurred during the direct appeal phase of Plaintiff's criminal case.

93. Defendants Mueller, Gastrow, and Valcarcel's purpose in debriefing Trinidad was to obtain information that would assist law enforcement in investigating and prosecuting criminal activity, including pending criminal cases.

94. Prior to these debriefings, Defendants Mueller, Gastrow, and Valcarcel knew that other Milwaukee police department detectives and FBI agents had debriefed Trinidad on numerous prior occasions, and that Trinidad had provided those law enforcement officers with truthful and reliable information regarding numerous incidents of criminal activity in the City of Milwaukee.

13

95. During the debriefings, Defendants Mueller, Gastrow, and Valcarcel considered Trinidad to be a truthful and reliable source of information.

96. During the debriefings, Trinidad discussed Plaintiff's case with Defendants Mueller, Gastrow, and Valcarcel.

97. Trinidad told Defendants Mueller, Gastrow, and Valcarcel that Plaintiff did not shoot Jake Gerard and that either Jose Luis Suares or Luis Correa was the real perpetrator.

98. Defendants Mueller, Gastrow, and Valcarcel, having participated in the Gerard homicide investigation, knew that Trinidad was referring to the Gerard homicide when Trinidad raised the issue of Plaintiff's innocence.

99. The information that Trinidad provided Defendants Mueller, Gastrow, and Valcarcel during the debriefings was evidence of Gabriel Lugo's actual innocence of the Gerard homicide.

100. Defendants Mueller, Gastrow, and Valcarcel knew that the information Trinidad provided them regarding the Gerard homicide was material, exculpatory, and exonerating of Plaintiff.

101. Defendants Mueller, Gastrow, and Valcarcel did not take any steps to pursue this information when Trinidad repeatedly raised the matter of Plaintiff's innocence.

102. Defendants Mueller, Gastrow, and Valcarcel did not provide the information they received from Trinidad during debriefings to the Milwaukee County District Attorney's Office or to Plaintiff or his defense attorney.

103. Defendants Mueller, Gastrow, and Valcarcel suppressed this highly exculpatory information in order to cover up their own participation in the wrongful prosecution and conviction of an innocent man.

14

104.    Had Defendants Mueller, Gastrow, and Valcarcel provided the information they received from Trinidad to the Milwaukee County District Attorney's Office or to Plaintiff or his defense attorney, Plaintiff's conviction would have been overturned years earlier than it was.

**Plaintiff's Exoneration**

105.    In 2020, Plaintiff filed a motion for post-conviction relief.

106.    In 2022 and 2023, Judge Yamahiro of the Circuit Court of Milwaukee County conducted an evidentiary hearing on Plaintiff's motion for post-conviction relief, which included testimony from Trinidad among others.

107.    Trinidad testified that Lugo was innocent and was not even present the night of the shooting.

108.    On May 19, 2023, Judge Yamahiro granted Plaintiff's motion for post-conviction relief, vacated his conviction and sentence, and ordered a new trial.

109.    In his ruling, Judge Yamahiro stated that he believed Trinidad's statements and a written affidavit from Correa in which Correa stated Plaintiff had no role in the crime, that Suares was the real killer, and that Suares paid him $5,000 and an ounce of cocaine to help him pin the crime on Plaintiff.

110.    On October 4, 2023, the Milwaukee County District Attorneys' Office moved to dismiss the charges, the court granted the motion, and all charges against Plaintiff were dismissed.

111.    On January 30, 2025, the State of Wisconsin Claims Board granted Plaintiff's Petition for Compensation for Wrongful Imprisonment of an Innocent Person, concluding that the evidence was clear and convincing that Plaintiff was innocent of the Gerard homicide.

15

112. The Defendant Officers, acting jointly, together reached an understanding, engaged in an ongoing course of conduct and joint action, and otherwise conspired and continue to conspire among and between themselves and with the civilian witnesses Suares, Correa, and Montanez and FBI agent Homer to deprive Plaintiff of his constitutional rights.

113. This conspiracy is evidenced, *inter alia*, by the overt acts set forth above and below, including, but not limited to, knowingly encouraging and facilitating Suares, Correa, and Montanez to provide false, fabricated statements and testimony, and suppressing exculpatory and exonerating evidence of actual innocence. By and through these overt acts, the Defendant Officers, jointly and in conspiracy, with a shared understanding, intent, and/or meeting of the minds, deprived and continue to deprive Plaintiff of his constitutional rights.

**Policies and Practices**

114. The constitutional violations that caused Plaintiff's wrongful conviction were the result of the City of Milwaukee and its Police Department's policies and practices of, *inter alia*, pursuing and continuing wrongful convictions through reliance on materially flawed investigations and fabricated evidence including witness statements; failing to produce to criminal defendants exculpatory information and materials including handwritten notes of interviews; failing to document all relevant information learned during the course of an investigation and disclose it to criminal defendants; failing to properly investigate alternative suspects; failing to adequately train, supervise, monitor, and discipline Milwaukee police officers; and maintaining the police code of silence.

115. The practices described above and below were consciously approved at the highest policy-making level for decisions involving the Milwaukee Police Department (MPD) and proximately caused Plaintiff's injuries.

116. Consistent with the municipal policies and practices described above and below, the Defendant Officers in this case fabricated inculpatory evidence and concealed exculpatory and exonerating evidence which was never disclosed to the Milwaukee County District Attorney's Office or to Plaintiff or his criminal defense attorneys.

117. The wrongful convictions of innocent persons based on materially flawed investigations include numerous cases in which MPD detectives used similar tactics to those employed by the Defendants against Plaintiff in this case, including fabrication of evidence; concealment of exculpatory information; failing to investigate alternative suspects; encouraging, facilitating, and manufacturing false testimony; and other unlawful tactics to secure the arrest, prosecution, conviction, and imprisonment of innocent persons.

118. Cases in which Milwaukee police officers used similar tactics to secure wrongful convictions include, *inter alia*, the wrongful convictions of William Avery, Chaunte Ott, Danny Wilber, and Santos Sanchez, and the wrongful prosecution of Larnell Washington.

119. As a matter of both policy and practice, municipal policymakers and MPD supervisors condoned and facilitated a code of silence within the Milwaukee Police Department.

120. In accordance with this code, MPD officers, including, but not limited to, the Defendant Officers, refused to report and otherwise lied and covered up misconduct committed by their colleagues, including the misconduct at issue in this case.

121. As a result of the City of Milwaukee's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct;

17

failing to investigate cases in which the police are implicated in obtaining false witness statements, as well as wrongful charges and convictions and withholding exculpatory evidence; failing to discipline officers accused of this unlawful conduct; and facilitating a code of silence within the Department, MPD officers, including the Defendant Officers, have come to believe that they may violate the constitutional rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences.

122. The City's failure to train, supervise, monitor, and discipline its officers effectively encourages, condones, ratifies, and sanctions the kind of misconduct that the Defendant Officers committed against Plaintiff in this case. Constitutional violations such as occurred in this case are encouraged and facilitated as a result of the City and its Police Department's practices, customs, and *de facto* policies, as alleged above, and these policies, practices, and customs were implemented with deliberate indifference and were a moving force behind these violations.

123. The City of Milwaukee and officials within the Milwaukee Police Department failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the patterns of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken to remedy Plaintiff's ongoing injuries.

### Damages

124. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, malicious and/or deliberately indifferent acts and omissions, which were committed in intentional disregard of Plaintiff's rights, Plaintiff sustained injuries and damages, including loss of his freedom for 14 years, loss of his youth, personal injuries, pain and suffering, severe mental anguish, and emotional distress. In addition, he also sustained further injuries and damages,

18

including inadequate medical care, humiliation, indignities, embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom, including but not limited to, diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression, for which he is entitled to monetary relief.

**COUNT I – 42 U.S.C. § 1983**
**Fourteenth Amendment – Violation of Due Process**

125. Each paragraph of this Complaint is incorporated as if restated fully herein.

126. As described more fully above, the Defendant Officers, while acting individually, jointly, and/or in concert and in conspiracy with each other and with other non-defendant co-conspirators, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process.

127. In the manner described more fully above, the Defendant Officers, individually, jointly, and/or in concert and in conspiracy with each other and with other non-defendant co-conspirators, initiated and continued Plaintiff's wrongful prosecution, conviction, and imprisonment by fabricating evidence and withholding from the prosecutors, judges, and defense attorneys involved in Plaintiff's prosecution exculpatory and impeaching evidence of their misconduct and Plaintiff's actual innocence.

128. Absent the Defendant Officers' misconduct, the prosecution and wrongful conviction of Plaintiff could not and would not have pursued or continued, and Plaintiff would not have been imprisoned, and otherwise deprived of liberty.

129. The Defendant Officers' misconduct directly and proximately caused the unjust and wrongful criminal conviction, wrongful imprisonment, and deprivation of liberty of Plaintiff,

19

thereby denying him his constitutional right to fair hearings and a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

130. The misconduct described in this Count was objectively unreasonable, shocked the conscience, interfered with rights implicit in the concept of ordered liberty, and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

131. As a direct and proximate result of this violation of his constitutional right to due process, Plaintiff suffered injuries and damages as set forth above, including but not limited to loss of liberty, physical injury, and emotional distress.

**COUNT II – 42 U.S.C. § 1983**
**Failure to Intervene**

132. Each paragraph of this Complaint is incorporated as if restated fully herein.

133. The Defendant Officers were aware of the constitutional violations as set forth above and had the opportunity and duty to intervene and prevent the violation of Plaintiff's constitutional rights, but they failed to do so.

134. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

135. As a direct and proximate result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries as set forth above, including but not limited to loss of liberty, physical harm, and emotional distress.

**COUNT III – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**

136. Each paragraph of this Complaint is incorporated as if restated fully herein.

20

137. The Defendant Officers reached an agreement between and amongst themselves and with other non-defendant co-conspirators to fabricate inculpatory evidence and withhold exculpatory evidence, and to thereby deprive Plaintiff of his constitutional rights.

138. Additionally, after Plaintiff's conviction, Defendants Mueller, Gastrow, and Valcarcel further conspired, and continue to conspire, to deprive Plaintiff of exculpatory information and materials to which he was lawfully entitled and which would have led to the more timely reversal of his wrongful conviction and his exoneration of the false charges.

139. In this manner, the Defendant Officers have conspired by concerted action to accomplish an unlawful purpose by an unlawful means.

140. In furtherance of the conspiracy, the Defendant Officers committed one or more overt acts including, but not limited to, those set forth in the facts above, and were otherwise willful participants in joint activity.

141. The Defendant Officers' misconduct was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiff's constitutional rights.

142. As a direct and proximate result of the illicit prior agreement, conspiracy, and joint action referenced above, Plaintiff's rights were violated and he suffered the damages and injuries as previously set forth.

## COUNT IV – 42 U.S.C. § 1983
### *Monell* Policies and Practices

143. Each paragraph of this Complaint is incorporated as if restated fully herein.

144. The actions of the Defendant Officers were undertaken pursuant to policies, practices, and customs of the City of Milwaukee, by and through its Police Department, described above, which were approved, encouraged, and/or ratified by policymakers for the City

21

of Milwaukee with final policymaking authority for the MPD's actions and omissions alleged above.

145. These policies, practices, and customs, as set forth in greater detail above, included the failure to adequately train, supervise, monitor, and discipline MPD officers who engaged in the constitutional violations, the pursuit and continuation of wrongful convictions through reliance on materially flawed investigations, the fabrication of evidence including witness statements, the suppression of exculpatory evidence, and the police code of silence.

146. One or more of the policies, practices, and customs described in this Count and in the facts above were maintained and implemented by the City of Milwaukee by and through its Police Department with deliberate indifference to Plaintiff's constitutional rights and were a moving force behind the violations of those rights.

147. As a direct and proximate result of the City's actions and inactions, Plaintiff's constitutional rights were violated, and he suffered injuries and damages, as set forth above.

### COUNT V – State Law Claim
### Malicious Prosecution

148. Each paragraph of this Complaint is incorporated as if restated fully herein.

149. Defendants Mueller, Gastrow, and Valcarcel, acting individually, jointly and/or in conspiracy, with malice, and knowing that probable cause did not exist to continue to prosecute Plaintiff for the Jake Gerard homicide, caused Plaintiff's continuing prosecution for that crime.

150. Defendants Mueller, Gastrow, and Valcarcel withheld critical exculpatory and exonerating evidence of Plaintiff's actual innocence that would have vitiated probable cause to continue the prosecution of Plaintiff, namely evidence indicating that Plaintiff was not involved in the homicide of Jake Gerard and evidence indicating the identity of the real perpetrators.

22

151. The prosecution of Plaintiff terminated in his favor and in manner that is indicative of innocence.

152. The actions of Defendants Mueller, Gastrow, and Valcarcel constituted the tort of malicious prosecution under Wisconsin state law and caused the injuries set forth above.

## COUNT VI – State Law Claim
### Intentional Infliction of Emotional Distress

153. Each paragraph of this Complaint is incorporated as if restated fully herein.

154. The actions of Defendants Mueller, Gastrow, and Valcarcel in continuing a malicious prosecution without probable cause against Plaintiff were extreme and outrageous.

155. Defendants Mueller, Gastrow, and Valcarcel acted willfully and wantonly, intended to inflict severe emotional distress on Plaintiff, and/or knew that their conduct would cause Plaintiff severe emotional distress.

156. As a proximate result of Defendants Mueller, Gastrow, and Valcarcel's extreme and outrageous conduct, Plaintiff was injured and experienced severe emotional distress.

157. The actions of Defendants Mueller, Gastrow, and Valcarcel constituted the tort of intentional infliction of emotional distress under Wisconsin law and caused the injuries set forth above.

## COUNT VII – State Law Claim
### Legal Malpractice

158. Each paragraph of this Complaint is incorporated as if restated fully herein.

159. Defendant Boyle had a legal duty to represent Plaintiff to the best of her ability during his criminal proceedings.

160. Defendant Boyle breached that duty by failing to conduct an adequate investigation into Plaintiff's case, failing to present a competent defense at trial, and abandoning Plaintiff's appeal after his conviction, as set forth above.

161. Defendant Boyle's failure was a proximate cause of Plaintiff's wrongful conviction and imprisonment for crimes he did not commit.

162. As a proximate result of Defendant's actions, Plaintiff suffered injuries as set forth above, including but not limited to loss of liberty, physical harm, and emotional distress.

163. Defendant Lloyd's of London, Defendant Boyle's malpractice insurer during the relevant time, is liable to Plaintiff for damages suffered as a result of Defendant Boyle's actions and inactions, as alleged in this Complaint.

164. Pursuant to Wis. Stat. § 632.24, Plaintiff is entitled to maintain a direct action against Defendant Lloyd's of London.

### COUNT VIII – Indemnification

165. Each paragraph of this Complaint is incorporated as if restated fully herein.

166. In Wisconsin, pursuant to Wis. Stat. § 895.46, public entities must pay any tort judgment for damages for which employees are liable for acts within the scope of their employment.

167. At all times relevant to this action, the Defendant Officers committed the acts alleged above in the scope of their employment with Defendant City of Milwaukee. Therefore, Defendant City of Milwaukee is liable as their employers for any resulting damages or award of attorney's fees.

24

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff demands compensatory damages, jointly and severally, from Defendants Charles Mueller, Scott Gastrow, Abner Valcarcel, David Salazar, Paul Lough, Timothy Heier, Matthew Goldberg, the City of Milwaukee, Bridget Boyle, and Lloyd's of London and he further demands punitive damages against Defendants Mueller, Gastrow, Valcarcel, Salazar, Lough, Heier, Goldberg, and Boyle, plus attorneys' fees, the costs of this action, pre- and post-judgment interest as allowed by law, and whatever additional relief this Court deems equitable and just.

## JURY DEMAND

Plaintiff Gabriel Lugo demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Dated: May 18, 2026

Respectfully submitted,

/s/ Ben H. Elson
Ben H. Elson
G. Flint Taylor
Nora P. Snyder
PEOPLE'S LAW OFFICE
1180 N. Milwaukee Ave.
Chicago, IL 60642
(773) 235-0070

***Attorneys for Plaintiff Lugo***

25